NO. <u>24-5110</u>

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Tami M. Dixon,

Appellant,

v.

Janet L. Yellen, in her official capacity, Department of Treasury, et al.,

Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

APPELLANT'S OPENING BRIEF

---

Theresa Dawn Truitt Kraft
Wilt Toikka Kraft, LLP
1629 K Street NW, Suite 300
Washington, DC 20006
Tel: (603) 568-2464
tkraft@wtk-law.com

# TABLE OF CONTENTS

I.  STATEMENT OF APPELLATE JURISDICTION ............................1

II.  STANDARDS OF APPELLATE REVIEW ...........................................1

III. STATEMENT OF ISSUES PRESENTED FOR REVIEW ................2

IV.  STATUTES AND REGULATIONS .....................................................2

V.  STATEMENT OF CASE ........................................................................2

VI.    SUMMARY OF ARGUMENT ........................................................**14**

    A.  THE DISTRICT COURT'S DECISION ON TITLE VII RELIGIOUS

DISCRIMINATION ....................................................................................16

    B.  THE DISTRICT COURT'S DECISION ON SECTION 501 DISABILITY

DISCRIMINATION ....................................................................................19

VII.  CONCLUSION .................................................................................**23**

VIII.  REQUEST FOR ORAL ARGUMENT ...........................................**23**

## TABLE OF AUTHORITIES

<u>Cases</u>

*Adams v. Rice*, 531 F.3d 936, 943, 382 U.S. App. D.C. 207 (D.C. Cir. 2008) ........20

*Alexander v. Wash. Metro. Transit Auth*., 826 F.3d 544, 548, 423 U.S. App. D.C.

　380 (D.C. Cir. 2016) ........................................................................20

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)....2

*Azzam v. Dist. of Columbia*, No. 19-CV-3365 (TSC), 2022 U.S. Dist. LEXIS

　164468, 2022 WL 4182187, at *6 (D.D.C. Sept. 13, 2022) ...............................18

*Baloch v. Kempthorne*, 550 F.3d 1191, 1196, 384 U.S. App. D.C. 85 (D.C. Cir.

　2008) ....................................................................................15

*Brown v. Sessoms*, 774 F.3d 1016, 1022, 413 U.S. App. D.C. 328 (D.C. Cir. 2014)

　.........................................................................................18

*Conley* v. *Gibson,* 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)................15

*Doe #1 v. Am. Fed'n of Gov't Emps.,* 554 F. Supp. 3d 75, 102 (D.D.C. 2021)........18

*Fennell v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011)...................................16

*Gallo v. Wash. Nat'ls. Baseball Club, LLC,* No. 22-cv-01092 (APM), 2023 WL

　2455678, at *4 (D.D.C. Mar. 10, 2023) ..............................................22

*Harris v. Wilson*, 282 F. Supp. 3d 80, 83 (D.D.C. 2017)........................................16

*Ingram v. D.C. Child & Fam. Servs. Agency,* 394 F. Supp. 3d 119, 126 (D.D.C.

　2019) ....................................................................................20

*Keith v. United States Gov't Accountability Off.*, Civil Action No. 21-2010 (RC), 2022 U.S. Dist. LEXIS 154586, *3 (D.D.C. Aug. 29, 2022)...............................18

*Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168-169, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993)..........................15

*Owens v. Thompson*, Civil Action No. 23-662 (TSC), 2024 U.S. Dist. LEXIS 55855, *7 (D.D.C. Mar. 28, 2024) .......................................................................18

*Sparrow v. United Air Lines, Inc.,* 342 U.S. App. D.C. 268, 216 F.3d 1111, 1115 (2000)...............................................................................................................16

*Swierkiewicz v. Sorema N.A.* 534 U.S. 506, 512-13, 122 S. Ct. 992, 998 (2002) ...15

*Thompson v. Rice*, 422 F. Supp. 2d 158, 175 (D.D.C. 2006) ..................................21

*Vila v. Inter-Am. Inv., Corp.*, 570 F.3d 274, 278, 386 U.S. App. D.C. 364 (2009)....1

<u>Statutes</u>

28 U.S.C. § 1291 ...................................................................................................1, 2

28 U.S.C. § 1331 ......................................................................................................1

29 U.S.C. § 705 ......................................................................................................19

29 U.S.C. § 791 ..................................................................................................2, 14

42 U.S.C. § 2000(e) ..................................................................................................1

42 U.S.C. § 2000bb ..................................................................................................2

42 U.S.C. § 2000e ..............................................................................................2, 14

42 U.S.C.S. § 12102 ...............................................................................................19

Other Authorities

5 C. Wright & A. Miller, Federal Practice and Procedure § 1202, p. 76 (2d ed. 1990)). .................................................................................................................15

Rules

12(b)(6)..........................................................................................................2, 14

Rule 8(a) ............................................................................................................14

Regulations

5 C.F.R. § 213.3102(u) .........................................................................................3

## I.        STATEMENT OF APPELLATE JURISDICTION

This case is based on claims of religious discrimination, disability discrimination, retaliation, and hostile work environment against Appellant's former employer, the Department of Treasury, and violation of the Religious Freedom Reformation Act against Appellant's former co-workers, Michael M. Lieberman, Christa Pennifill, and Jacqueline Brewer. The District Court had subject matter jurisdiction for the complaint pursuant to 28 U.S.C. § 1331 for claims arising under federal law, i.e. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et. seq., Section 501 of the Rehabilitation Act, and the Religious Freedom Reformation Act. The District Court granted Defendant-Appellees' motions to dismiss on March 21, 2024. On April 8, 2024, Appellant timely filed a notice of Appeal from the final order of the District Court granting dismissal. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II.        STANDARDS OF APPELLATE REVIEW

This Court reviews *de novo* the dismissal of a complaint for failure to state a claim, accepting a plaintiff's factual allegations as true and drawing all reasonable inferences in a plaintiff's favor. *Vila v. Inter-Am. Inv., Corp.*, 570 F.3d 274, 278, 386 U.S. App. D.C. 364 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is

1

plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

### III.  STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether the District Court erred by granting Defendant-Appellees' motions to dismiss by holding Appellant to a higher standard than required under to survive a motion to dismiss under Rule 12(b)(6).

### IV.  STATUTES AND REGULATIONS

Appellant relies on the following statutes and regulations: 28 U.S.C. § 1291; 28 U.S.C. § 1331; 42 U.S.C. § 2000e, Title VII of the Civil Rights Act; 42 U.S.C. § 2000bb, the Religious Freedom Restoration Act; and 29 U.S.C. § 791, the Rehabilitation Act.

### V.  STATEMENT OF CASE

Appellant Tami Dixon (Dixon) filed this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16; 42 U.S.C. § 2000bb; 29 U.S.C. § 791; and the First Amendment to the United States Constitution. *JA0101*. Dixon alleged that Appellees discriminated against her on the basis of her religion and her disability. Between October 2015 and July 2022, Dixon worked for the Department of Treasury in a contract position and then as an employee. *JA0104.* When Dixon was hired in January 2019, she was under the Federal Government's

Schedule A[1] hiring authority, even though Dixon had competed for the position. *JA0103.* Thus, the Department of Transportation was aware of Dixon's disability through the hiring process. *JA0104.*

Dixon is a woman of faith whose religious beliefs and practices are based on the Christian theory of human rights, derived from the idea of *Imago Dei* that humans are created in the image of God. *JA0104.* Dixon's beliefs include the concept that there is a God-given right to bodily integrity. *Id.* This concept has been reiterated in the First and Fifth Amendments to the U.S. Constitution. *Id.*

Central to Dixon's religious belief and practice are the requirements that she treat her body as a temple, to seek knowledge to understand God's will, and to make informed consent regarding any conduct attempted against her body. *Id.* These core values are paramount to Dixon's identity as a Christian woman. *JA0105.*

In response to the COVID-19 outbreak, Executive Order 14043 was issued, which mandated that all executive agency employees be fully vaccinated against COVID-19 no later than November 22, 2021. *JA0105.* As the Department of Treasury began demanding proof of vaccination, Dixon submitted a request for a

---

[1] Schedule A is a streamlined hiring process that allows agencies to non-competitively hire an individual with disabilities. *See* 5 C.F.R. § 213.3102(u).

religious exemption as allowed by federal law under Title VII. *Id.* The mandate

allowed for both medical and religious exemptions. *Id.*

Per the procedure and instructions provided by her supervisor, Dixon

requested a religious accommodation that would exempt her from the mandatory

requirements of E.O. 14043. *JA0105.* In the request, Dixon explained

> As an individual of faith, it is my sincerely held religious belief
> that I and all of humanity are created in the image of a Divine
> Creator and are therefore divine and autonomous beings with
> the inherent God-given right to bodily autonomy and the right
> to exercise our own free will. The Word guiding my faith
> teaches that my body is the temple of the Holy Spirit and it
> states that individuals are to act consistently with their
> conscience with the guidance and prompting of the indwelling
> Spirit. In obedience to my faith, I have sought information and
> understand that these injections are currently still in the clinical
> research phase subject to written informed consent and are not
> defined as a medical treatment intended to address the needs of
> individual patients.
>
> I have witnessed the increased social pressure and public
> proclamations that occurred before this internal directive to
> staff was sent demanding that I act in making an intensely
> personal decision for myself based primarily on the external
> inputs of media, public officials, and immediate social
> acquaintances based on their interpretation of facts and
> circumstances surrounding this experimental injection.
> Consequently, I have prayed and sought God's wisdom on this
> important matter. Based on the full sum of my faith and the
> inner promptings of what I believe to be the Spirit of a living
> and ever-present God within me, I feel a conviction in my spirit
> that I should not consent to this injection. There is not sufficient
> information yet available to inform me in my need for self-
> protection to garner my consent. God has prompted me that
> experimentation on humanity at this level without transparent
> disclosure of the Institutional Review Boards (IRBs) overseeing

each of these clinical trials or *advance* information provided to the research subjects about the duration of the study or the number of shots they will be required to take by the conclusion of the study *before beginning* each study is immoral. I have prayed about this matter, and I must follow the promptings of God's wisdom and inner spirit within me. I must listen to my liberty of conscience and treat my body in a way that is consistent with God's Word. I cannot knowingly expose it to potential danger or mistreatment.

*JA0105-JA0106.* Dixon additionally requested a medical exemption based on her family history as well as her own health. *JA0106.* Dixon referenced the Schedule A letter in support of her disability. *Id.* Dixon requested continued remote work as an accommodation for either exemption.[2] *Id.*

In response to new agency guidance, Dixon supplemented her religious and medical exemptions requests. As part of her faith, Dixon believes she cannot allow any medical procedures or put any foreign substances in her body without informed consent. *JA0107.* Dixon attempted to find information that would allow her to give and have informed consent to the vaccination. *Id.*

Dixon would learn that there was a three-person committee formed to review and decide religious and medical exemption requests. *Id.* However, to Dixon's knowledge, the committee never reviewed her requests or made any decisions regarding the requests. *Id.* Dixon was subjected to threats of fines and

---

[2] Remote work and Telework have different meanings within the federal workplace. Remote work refers to situations in which the employee is not required to come into the office because the employee is local to the office. Telework refers to employees who reside within a certain distance of the office and can, if needed, come into the office. *See JA0113 at ¶ 43.*

imprisonment under Title 18 of the U.S. Federal Code. *Id.* Dixon received mass emails, newsletters, new versions of the Treasury Privacy Act Statement, and requests for multiple Attestation Statements through the Human Resources Connect system. *Id.* Not included in the deluge of communications was how the requests for exemptions would be processed. *JA0108.* The mass emails and communications created anxiety and stress – Dixon feared that she would be punished for not receiving the vaccination. *Id.*

In November 2021, Dixon, was concerned about the information being disseminated by the Safer Federal Workforces Task Force. The training provided to agencies included the use of discipline. *JA0108.* The guidance further advised that agencies require requests for exemptions by a certain date to better understand the scope, specifically because once an exception in a job category is granted it's very hard to say that a similarly situated person would be denied. *Id.*

In late November, Dixon received an email informing her that her religious exemption request had been received and that it was under consideration. Dixon was told that if she was required to report to a physical work cite, mandatory rapid testing and mask protocols must be followed. *JA0109.* Concerned that she was being treated differently because of her unvaccinated status, Dixon contacted her supervisor, human resources, and the Equal Employment Opportunity office to say she felt that the agency was treating her as if she were a diseased person, which

violated her rights. *Id.* Dixon shared that she had been deemed an unsafe employee for no reason other than her sincerely held religious beliefs and unvaccinated status. *JA0109-JA0110.*

As other employees had done during the pandemic, Dixon traveled to Washington state to be with family. Dixon requested management approval[3] to stay in Washington state through May 2022 to continue to help with family legal and other matters related to a deceased relative. *JA0110.* There were numerous dates set for the return to the office. The first date was January 3, 2022. *Id.* Dixon feared her failure to comply with the mandate requirements would be the reason the agency fired her as her requests for exemptions had not been granted or denied.

While Dixon waited for a decision about her requests for exemptions, she received multiple onerous communications from the Reasonable Accommodation Office about how unvaccinated staff would be treated differently once the return to office was implemented. *JA0110.* Multiple communications were sent that reminded Dixon of the vaccination deadline and the possibility of termination if she did not comply. *Id.* Dixon no longer felt safe returning to DC to work in person. *Id.* The level of hate directed at unvaccinated people was difficult to fathom unless you were living through it. *Id.* Attempts to discuss her fear for her

---

[3] Dixon's supervisory was aware of the travel and the intent for Dixon to work from Washington state and did not voice any concerns or objections. Dixon was requesting approval from management above her first line supervisor. *JA0110.*

safety with her supervisor were meet with comments such as let's "focus on casework." *Id.* In December 2021, Dixon contacted the EEO office about the lack of information and the agency's failure to do anything with her religious exemption request.

In January 2022, Dixon was informed via email that Executive Order 14043 would not be implemented and all activities to process exemption requests would be paused. *JA0112.* Although the Executive Order was not implemented in the short term, there was still a possibility that it would be implemented at some time. Dixon had already been subjected to peer pressure from her second line supervisor who was not shy about making his belief that vaccinated people were good and unvaccinated people were bad. *Id.* When Dixon filed a formal complaint in February 2022, it was determined that Dixon was not an "aggrieved employee" because the Executive Order was not implemented. *JA0113.* This completely disregarded the requests for religious and medical exemptions for vaccinations as well as testing. Dixon had already voiced her concerns that she would be treated differently because of her unvaccinated status. *Id.*

Dixon submitted paperwork to allow remote work in March 2022. *JA0114.* After the submission, the remote work authorization, which had been approved by her first line supervisor, was removed from the internal system. *Id.* The reason provided for the removal was that it was rejected by the assistant secretary.

*JA0115.* As it was eventually explained to Dixon, if the original exemption request was based on receiving the vaccination, the request was paused until Executive Order 14043, and that Dixon would need to submit a separate exemption request for the mandatory testing for reentry to the building. *Id.* The exemptions requests submitted in September 2021 covered all aspects of the COVID-19 policy, so Dixon requested that the September request be reviewed. *Id.*

Dixon was concerned about the testing and re-entry program because it was a medical procedure was being conducted by the agency. *Id.* Dixon requested the informed consent disclosures. None were provided. Even though her remote work arrangement had been approved by her first line supervisor she was ordered to return to the office for one to two days per pay period by May 23, 2022. Dixon made several inquiries regarding the status of her remote work assignment and religious exemption request. *JA0116.* Human resources responded to the inquiries that someone had seen her request for a religious exemption and that Dixon was required to follow the return-to-work date. *Id.* While Dixon was not notified of the status of her exemption requests, she received a form email from an area named "COVID Safety" advising Dixon that she was required to be tested for COVID-19 during any week she is physically in the office and that the test can occur at any point during the week and does not have to occur prior to or at the time your first

report to the office during the week[4]. *Id.* The email further advised that the test

would be administered on-site at Treasury by a registered nurse using the "FDA-

authorized Abbott BinaxNOW" nasal swab. And Dixon would be required to

disclose to her supervisor each time she completed the mandatory test. *Id.*

Dixon filed a formal complaint on May 5, 2022. Dixon had been told that

the only remote work assignments that were being approved were for military

spouses. Even though Dixon had given the reason for the request for remote work

and its relation to her sincerely held religious beliefs and her first line supervisor

had approved the request, she was forced to disclose this information again to her

first line supervisor. *JA0117.* A discomfort continued to creep into Dixon due to her

first line supervisor violating her right to privacy and personal boundaries. *Id.*

On June 2, 2022, Dixon received notice that her requests for religious and

medical exemptions were denied. The denial cited questions about the nature and

tenets of Dixon's asserted religious belief and whether there is any conflict with the

policy requirements as opposed to simply Dixon's personal preference or desire to

avoid returning to the workplace. *Id.* The request for medical accommodation was

denied the same day. *Id.*

---

[4] If the purpose of testing was to identify those who had COVID so that they could be denied access to the building, thus preventing the spread of COVID, the fact that you could be tested at any time during the day and there was no requirement that you test before you enter seems ineffective.

By mid-July 2022, Dixon could no longer withstand the blatant disregard for her religious beliefs and the constant stress associated with attempting to explain to the agency how her religiously held beliefs required her to give informed consent for any action taken against her body. *Id.* Receiving a COVID-19 vaccination, being tested, and wearing a mask violated her religious beliefs because there was not enough information available from any agency or person who fulfilled the requirement of informed consent. *Id.* Dixon also could not withstand management's blatant disregard to policy information and instructions provided to management in the U.S. Department of Treasury COVID-19 Workplace Safety Plan of December 10, 2021 that stated approval of reasonable accommodation requests was to be done consistently, be based on each individual's fact specific request, and that if onsite testing was implemented the Bureau must report diagnostic and screening test results to the appropriate state or local health officials and ensure that employees undergoing testing receive the appropriate disclosures and consent to testing as discussed in the CDC Testing plan. *JA0120-JA0121.*

Dixon made a formal complaint to EEO on August 10, 2022. *JA0121.* Dixon recounted her requests for a religious exemption in which she referred back to her September 2021 for a full explanation of her religious beliefs and how those beliefs conflicted with the agency's policies. *Id.* Dixon expressed concerns that when the request was denied her religious beliefs were placed in question. Dixon's morality,

11

her commitment to God, her oath of office, and all she held dear were considered

suspect and it was opined that she simply had a personal preference to not work

onsite. *JA0123.*

Dixon brought the formal charges against the agency:

a.    Dixon has been discriminated against based on her religion
when from September 2021 through the present, the requests for
religious exemptions to the COVID-19 vaccine have been ignored and
finally denied on June 2, 2022, and again denied on July 29, 2022.
b.    Dixon has been retaliated against based on her pursuit of her
equal employment rights.
c.    The Treasury Department has infringed on Dixon's right to
freedom of religion.
d.    The Treasury Department has regarded Dixon as someone with
a disability when it required her to disclose her vaccination status.
e.    The Treasury Department retaliated against Dixon when it
threatened to bring disciplinary action against her for working
remotely, and for engaging in the EEO process when that was the only
avenue of redress available to her.  Agency Human Resources staff
refused to speak to her about her unreviewed and unadjudicated
Reasonable Accommodation request or provide any oversight of the
testing program or provision of informed consent related to this.
f.    The Treasury Department took adverse employment action
against Dixon when it refused to approve a Remote Work
Arrangement.
g.    The Treasury Department took adverse employment action
against Dixon when it created a hostile work environment forcing her
to seek employment elsewhere at a lower annual rate.
h.    The Treasury Department has violated Dixon's rights under the
Religious Freedom Reformation Act.

*JA0123.*

Dixon brought three counts in the lower court. Count I against Defendants

Lieberman, Pennifill, and Brewer alleging violation of the Religious Freedom

Restoration Act. *JA0124.* In particular, Dixon alleges that Mr. Lieberman expressed animosity towards those who were unvaccinated. *JA0125.* Mr. Lieberman was responsible for considering the request for religious exemption. *JA0126.* Mr. Lieberman glibly determined that Dixon's motive for requesting the exemption was her desire to not come into the office. *Id.* Mr. Lieberman did not value Ms. Dixon's religious convictions. *Id.* Mr. Lieberman required Ms. Dixon to choose between her job and her religious beliefs. *Id.* Dixon alleges that Ms. Pennifill conducted training sessions guiding the agency employees on how to request a Remote Work Agreement. *Id.* Ms. Pennifill was aware that Ms. Dixon participated in the training because she was requesting a religious exemption from the mandatory vaccination and testing protocol. *Id.* Ms. Pennifill was aware that Ms. Dixon submitted a request for a Remote Work Agreement. *Id.* Ms. Pennifill denied Ms. Dixon's request for a Remote Work Agreement because she did not have an accommodation.[5] *Id.* Ms. Dixon experienced fear and apprehension as a result of the denial of the religious exemption and the Remote Work Agreement. *JA0127.* Ms. Brewer was aware of Ms. Dixon's vaccination status and her requests for exemptions. *Id.* Ms. Brewer did not want to help Ms. Dixon navigate the religious exemption process. *Id.* At least one affidavit included in the Report on

---

[5] Although Dixon was told the request for a Remote Work Agreement was denied by the Secretary of the Treasury, in an affidavit filed in the Report on Investigation, Mr. Lieberman averred that the request was denied because Dixon did not have an accommodation. At times it seems like a flow chart or some other demonstrative is necessary to keep track of the differing stories told by different people who claim to know what the policies were.

Investigation attributes the denial of Ms. Dixon's requests for accommodation and exemption to Ms. Brewer. *Id.* Ms. Dixon suffered harm because she was threatened with increasing discipline causing emotional distress. *Id.* Ms. Dixon suffered harm because she experienced a level of peer pressure that was designed to make her abandon her sincerely held religious beliefs. *Id.* Ms. Dixon suffered harm because she had no choice but to seek other employment. *Id.*

Count II of the Amended Complaint alleges that the agency violated 29 U.S.C. § 791 ("Section 501") because the agency perceived Ms. Dixon as being a diseased person unless and until she tested negative for the COVID-19 virus.

Count III of the Amended Complaint alleges that the agency violated 42 U.S.C. § 2000e ("Title VII") by discriminating against Ms. Dixon on the basis of her religious beliefs.

The district court, using a stricter standard than required under Rule 8(a) and its interpreting caselaw, dismissed all allegations for failure to state a claim under 12(b)(6).

## VI.    <u>SUMMARY OF ARGUMENT</u>

The Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it

rests." *Conley* v. *Gibson,* 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). In

*Swierkiewicz v. Sorema N.A.,* the Supreme Court of the United States opined that

this simplified notice pleading standard relies on liberal discovery rules and

summary judgment motions to define disputed facts and issues and to dispose of

unmeritorious claims. 534 U.S. 506, 512-13, 122 S. Ct. 992, 998 (2002). (citing

*Conley* at 47-48; *Leatherman* v. *Tarrant County Narcotics Intelligence and*

*Coordination Unit,* 507 U.S. 163, 168-169, 122 L. Ed. 2d 517, 113 S. Ct. 1160

(1993)). "The provisions for discovery are so flexible and the provisions for

pretrial procedure and summary judgment so effective, that attempted surprise in

federal practice is aborted very easily, synthetic issues detected, and the gravamen

of the dispute brought frankly into the open for the inspection of the court."

*Swierkiewicz* at 998 (*quoting* 5 C. Wright & A. Miller, Federal Practice and

Procedure § 1202, p. 76 (2d ed. 1990)).

   The Federal Rules do not contain a heightened pleading standard for

employment discrimination suits. While a plaintiff need not plead all the elements

of a *prima facie* case, she must nevertheless plead sufficient facts to show a

plausible entitlement to relief. Under Title VII, the two essential elements for a

discrimination claim are that (i) the plaintiff suffered an adverse employment

action (ii) because of her race, color, religion, sex, or national origin. *See Baloch v.*

*Kempthorne*, 550 F.3d 1191, 1196, 384 U.S. App. D.C. 85 (D.C. Cir. 2008).  The

pleading burden is not great, and courts in this Circuit have consistently recognized the "ease with which a plaintiff claiming employment discrimination can survive a . . . motion to dismiss." *Fennell v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011) (cleaned up). "Because racial discrimination in employment is 'a claim upon which relief can be granted,'…. 'I was turned down for a job because of my race' is all a complaint has to say" to survive a motion to dismiss under Rule 12(b)(6). *Sparrow v. United Air Lines, Inc.,* 342 U.S. App. D.C. 268, 216 F.3d 1111, 1115 (2000), citing *Bennett*, 153 F.3d at 518.

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Harris v. Wilson*, 282 F. Supp. 3d 80, 83 (D.D.C. 2017) (cleaned up).

### a. The District Court's Decision on Title VII Religious Discrimination

The district court judged Ms. Dixon's complaint under a stricter standard that required at the motion to dismiss stage. Importantly, the district court's decision found

> [T]he two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008). Defendants do not dispute that the denial of a remote work schedule constitutes an adverse

16

employment decision. See Sec.'s Mot. at 15–16. The question therefore is whether the Secretary's denial gives rise to "an inference of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002). It does not.

*JA0344.* The district court went further to state that

> Dixon argues that she has adequately pleaded "an inference of discrimination" because her request to work remotely as a religious accommodation was denied, but "others . . . who were requesting [it] . . . for family circumstance were approved." Pl.'s Opp'n to Sec.'s Mot. at 9. A plaintiff can show an inference of discrimination by "demonstrating that she was treated differently from similarly situated employees who are not part of the protected class," *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005), but such method of proof requires that "all of the relevant aspects of [the plaintiff's] employment situation were *nearly identical* to those" of her comparators, *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (emphasis added). Dixon's Complaint contains no details that would permit an inference of religious animus. The Complaint only states that employees who were granted leave to telework were individuals with military families. Pl.'s Opp'n to Sec.'s Mot. at 4. Without any allegations showing that Dixon and these other employees performed "nearly identical" duties, *see Holbrook*, 196 F.3d at 261, or any other evidence to show that her requests to work remotely were denied due to her religious beliefs, the Title VII discrimination claim must be dismissed. *See Black v. Guzman*, No. 22-cv-1873 (BAH), 2023 WL 3055427, at *9 (D.D.C. Apr. 24, 2023) ("Failure to show that a similarly situated employee outside the same protected class was treated differently generally warrants dismissal of a Title VII disparate treatment discrimination claim.") (citing cases).

*JA0344-JA0345.*

Requiring that level of specificity to plausibly plead the elements of

religious discrimination is inconsistent with what courts generally consider to be "a

very low bar for alleging an inference of discrimination." *Azzam v. Dist. of Columbia*, No. 19-CV-3365 (TSC), 2022 U.S. Dist. LEXIS 164468, 2022 WL 4182187, at *6 (D.D.C. Sept. 13, 2022). For a Title VII claim to survive a motion to dismiss, a court should grant a plaintiff the benefit of all inferences that can be derived from the allegations. *Owens v. Thompson*, Civil Action No. 23-662 (TSC), 2024 U.S. Dist. LEXIS 55855, *7 (D.D.C. Mar. 28, 2024) (cleaned up).

The "plaintiff must 'allege **some** facts that demonstrate [that her] [religion] was the reason for defendant's actions.'" *Doe #1 v. Am. Fed'n of Gov't Emps.,* 554 F. Supp. 3d 75, 102 (D.D.C. 2021) (citation omitted) (emphasis added). One way that a plaintiff may plead an inference of discrimination is "by showing 'that she was treated differently from similarly situated employees who are not part of the protected class.'" *Brown v. Sessoms*, 774 F.3d 1016, 1022, 413 U.S. App. D.C. 328 (D.C. Cir. 2014) (citation omitted). To do so, the plaintiff "must allege **some facts** to ground a reasonable inference that [she] was in fact similarly situated to comparator employees." *Keith v. United States Gov't Accountability Off.*, Civil Action No. 21-2010 (RC), 2022 U.S. Dist. LEXIS 154586, *3 (D.D.C. Aug. 29, 2022) (emphasis added).

The *Owens* court found the "nearly identical" comparators was a factor in determining a summary judgment and it did not alter the pleading standard on a motion to dismiss. *Owens,* *7. Thus, requiring Ms. Dixon to plead such specific

detail denied Ms. Dixon the opportunity to proceed to discovery, where she might uncover direct evidence of discrimination or circumstantial evidence of discrimination. The district court's decision to dismiss Ms. Dixon's religious discrimination claim should be reversed and the case remanded to continue to discovery.

The district court also found that the denial of the remote work assignment was not related to Ms. Dixon's request for religious exemption. The first amended complaint, at paragraph 58, clearly documented that her May 10, 2022, request for a remote work assignment was denied. *JA0118.* Additionally, paragraph 70 provided information that the remote work assignment was not approved because Ms. Dixon did not have a reasonable accommodation, even though she had requested a remote work assignment as a reasonable accommodation for her religious beliefs that conflicted with the agency's policy. *JA0123.*

### b.    The District Court's Decision on Section 501 Disability Discrimination

The Rehabilitation Act defines disability to include the meaning given it in section 3 of the Americans with Disabilities Act of 1990. 29 U.S.C. § 705. Section 3 of the ADA states that an individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived

physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C.S. § 12102.

"'Disability' is a[] term of art . . . that carries a specific meaning." *Adams v. Rice*, 531 F.3d 936, 943, 382 U.S. App. D.C. 207 (D.C. Cir. 2008). In order to qualify as disabled under the ADA, an individual must have "(A) a physical or mental impairment that substantially limits one or more major life activities of such an individual; (B) a record of such an impairment;" or (C) must be "regarded as having such an impairment." 42 U.S.C. § 12102(1). Importantly, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that . . . she has been subjected to [discrimination] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." Id. § 12102(3)(A); *see also Alexander v. Wash. Metro. Transit Auth*., 826 F.3d 544, 548, 423 U.S. App. D.C. 380 (D.C. Cir. 2016) (noting that a "regarded-as claim 'does not require a showing of an impairment that substantially limits a major life activity'" (quoting 29 C.F.R. § 1630.2(g)(3)). And Congress has made clear that "[t]he definition of disability . . . shall be construed in favor of broad coverage under th[e] [ADA]." *Ingram v. D.C. Child & Fam. Servs. Agency,* 394 F. Supp. 3d 119, 126 (D.D.C. 2019).

The district court erred in determining that Ms. Dixon's Section 501 claim should be dismissed because Ms. Dixon had not shown that any perceived disability substantially limited one or more major life activities. The Court focused on a definition of disability is no longer in effect. The Court determined "an individual 'is regarded as disabled if her employer mistakenly believes that the person has a physical impairment that substantially limits one or more major life activities' or 'mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.' *Thompson v. Rice*, 422 F. Supp. 2d 158, 175 (D.D.C. 2006) (cleaned up). *JA0342.* Rather, the Court should have used the following definition of disability: An "individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *42 U.S.C. § 12102(3)(A).*

The district court, citing cases pre-amendment to the ADA, incorrectly determined that because Ms. Dixon has not plead that the agency regarded her as having a disability that substantially limits one or more major life activities.

Additionally, the district court determined that, even if Ms. Dixon had provided information that would satisfy the heightened pleading standard it used,

COVID-19 could not be the basis for the perceived disability because COVID-19 was considered transitory. This blanket statement does not accurately reflect the facts Ms. Dixon pled. Ms. Dixon pled that the agency demanded proof of vaccination status[6] and mandatory testing for anyone unvaccinated who wished to enter the building for far longer than six months. The agency regarded Ms. Dixon as having a communicable disease unless and until she provided proof of vaccination or negative test results. The agency did not perceive Ms. Dixon as being a healthy person with only a potential to become ill and disabled in the future. *JA0343 (citing Gallo v. Wash. Nat'ls. Baseball Club, LLC,* No. 22-cv-01092 (APM), 2023 WL 2455678, at \*4 (D.D.C. Mar. 10, 2023). Ms. Dixon pled that the agency perceived Ms. Dixon as being diseased until such time as she proved the opposite. *JA0109.*

The Court went further to say that even if Ms. Dixon had pled that she was perceived as a disabled person, federal courts generally agree that a COVID-19 infection is not a disability. *JA0343.* While many federal courts have agreed that a COVID-19 infection is not a disability, guidance jointly developed by the Department of Health and Human Services and Department of Justice indicates

---

[6] TFI required people to **wear a bracelet** to confirm they had been tested upon entering the building. This goes further than the requirement to stand in line and receive a negative COVID-19 test. This additional requirement sent a message to all who encountered those unvaccinated as "safe" in that moment. Those who had been vaccinated did not have to ware any type of designation. This type of blatant discrimination is akin to requiring everyone of Jewish descent to wear a Star of David on their arm.

that certain forms of COVID-19 may be considered a disability under the ADA. *See Guidance on "Long COVID" as a Disability under the ADA, Section 504, and Section 1557*, DEP'T OF HEALTH & HUM. SERVS. & DEP'T OF JUSTICE (July 26, 2021), https://www.ada.gov/long_covid_joint_guidance.pdf. As this guidance details, COVID-19 "is a physiological condition affecting one or more body systems." *See id.* at 3. Accordingly, COVID-19 may be a "physical or mental impairment under the ADA." *See id.* Additionally, the guidance states that certain forms of COVID-19 can "substantially limit major life activity," *inter alia*, one's respiratory function, gastrointestinal function, and brain function, for periods lasting months after first being infected. *See id.* at 4. This guidance shows that without a fact-based inquiry, the perception of Ms. Dixon's status as a disabled person cannot be summarily dismissed.

## VII.   <u>CONCLUSION</u>

The district court erred in holding Ms. Dixon to a higher pleading standard than required by Rule 8(a) and its interpreting cases. Therefore, the district court's ruling should be reversed and the case remanded to proceed to discovery.

## VIII.  <u>REQUEST FOR ORAL ARGUMENT</u>

As this lawsuit is factually intensive, Appellant respectfully suggests that the Court would benefit from hearing counsel explain certain details that may shed further light on the issues. Some information may be lost in the cold record, and

some further elucidation beyond that contained in the written briefs would benefit

the Court in these proceedings. Appellant seeks reversal of the lower court's

application of the facts to this case to the law in addition to legal errors committed

by the lower court, and it is an understanding of the nuances in the facts of this

matter that oral argument would benefit.

Dated: December 2, 2024                   Respectfully submitted,
                                 By: */s/ Theresa Kraft*
                                     Theresa Kraft
                                     Wilt Toikka Kraft, LLP
                                     1629 K Street, NW, Suite 300
                                     Washington, DC 20006
                                     202-508-3648
                                     tkraft@wtk-law.com

                                     *Counsel for Appellant*

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that this Opening Brief of Appellant complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this document contains 5890 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

Furthermore, I hereby certify that this Opening Brief of Appellant complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in 14-point Times New Roman font.

*/s/ Theresa Kraft*
Theresa Kraft
Wilt Toikka Kraft, LLP
1629 K Street, NW, Suite 300
Washington, DC 20006
202-508-3648
tkraft@wtk-law.com

*Counsel for Appellant*

CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2024, I electronically filed the foregoing using the CM/ECF system, which will send a notification of electronic filing to counsel of record for Appellee.

*/s/ Theresa Kraft*
Theresa Kraft
Wilt Toikka Kraft, LLP
1629 K Street, NW, Suite 300
Washington, DC 20006
202-508-3648
tkraft@wtk-law.com

*Counsel for Appellant*